IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
_____

PPC BROADBAND, INC., d/b/a PPC,

                      Plaintiff,                Civil Action No.
                                              5:12-CV-0911 (GLS/DEP)

     v.

CORNING GILBERT, INC.,

                     Defendant.
_____

APPEARANCES:                   OF COUNSEL:

FOR PLAINTIFF:

HISCOCK & BARCLAY, LLP        DOUGLAS J. NASH, ESQ.
One Park Place                  JOHN D. COOK, ESQ.
300 South State Street        JASON C. HALPIN, ESQ.
Syracuse, NY 13202

FOR DEFENDANT:

DLA PIPER LLP (US)           JOSEPH P. LAVELLE, ESQ.
500 Eighth Avenue NW       ANDREW N. STEIN, ESQ.
Washington, DC 22004

HARTER, SECREST & Emery LLP   DAVID M. LASCELL, ESQ.
1600 Bausch & Lomb Place     JERAULD E. BRYDGES, ESQ.
Rochester, NY 14604

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

This is an action between two direct competitors in the cable and telecommunications industry who find themselves in the familiar posture of litigating over a patent dispute. Plaintiff PPC Broadband, Inc., d/b/a PPC ("PPC"), has commenced this action against defendant Corning Gilbert, Inc. ("Corning Gilbert"), alleging infringement of four separate patents relating to coaxial cable connectors. The patents in suit involve a connector design structure intended to foster continuity of grounding and electromagnetic shielding from the cable, to which the device is attached, to the coaxial cable interface port. Corning Gilbert has denied infringement, asserted several affirmative defenses, and counterclaimed seeking a declaratory judgment of non-infringement, patent invalidity, and unenforceability.

The parties now seek guidance from the court with respect to twelve disputed claim terms appearing in several of the four patents in suit.[1] The matter has been referred to me for the issuance of a report and recommendation regarding claim construction. The following constitute

---

[1]      Under the court's local patent rules, the parties may request that the court construe up to ten claim terms absent prior leave to submit additional terms. *See* N.D.N.Y. L. Pat. R. 4.4(b). In this instance, although the parties sought and obtained permission to expand that number to eighteen, Text Order Dated May 2, 2013, they have submitted only twelve for consideration of the court.

my recommendations, based upon comprehensive submissions from the parties and a claim construction hearing conducted by the court.

I.   BACKGROUND

At issue in this action are four related patents issued to inventors Eric Purdy, Noah Montena, and Jeremy Amidon, and assigned to PPC. Dkt. No. 24 at ¶¶ 13, 17, 21, 25. Those patents include U.S. Patent No. 8,192,237 (the "'237 Patent"), issued on June 5, 2012; U.S. Patent No. 8,287,320 (the "'320 Patent"), issued on October 16, 2012; U.S. Patent No. 8,313,353 (the "'353 Patent"), issued on November 20, 2012; and US Patent No. 8,323,060 (the "'060 Patent"), issued on December 4, 2012. Dkt. Nos. 24-1, 24-2, 24-3, 24-4. Generally, the four patents relate to connectors used to link coaxial cables with devices such as televisions, cable boxes, and computer modems. Dkt. No. 24 at ¶ 9.

The technology involved in the four patents in suit, as well as the coaxial cable industry generally, is not particularly complex. Coaxial cables provide a means for transmission of electronic signals, and are typically comprised of four elements, including (1) an outer coating, which acts as an environmental seal; (2) an outer conductor, typically a metal braid, designed to both prevent unwanted external magnetic signals and other influences from interfering with the electrical signals being conveyed

by the cable, and act as an electrical ground path; (3) a dielectric layer, which acts as an insulator; and (4) a center conductor through which the electrical signals travel. Dkt. No. 41-2 at ¶ 6. An important feature of a cable connector is the ability to provide a reliable ground path and electromagnetic shielding through the post component all the way to the receiving port. *Id.* at ¶¶ 7-8. In the event that such a reliable and complete ground path and shielding are lacking, significant transmission problems can occur, resulting in signal interruption, video pixilation, and data loss. *Id.* at ¶ 9.

The inventions disclosed in the four patents in suit address this issue of providing a complete ground path to the receiving port. Specifically, the patents disclose connectors designed to provide continuity even in the event of a loose connector not properly and fully secured to the receiving port. Dkt. No. 41-2 at ¶¶ 16-18. Prior to 2009, a connector that was loose typically presented gaps between the front face of the post and the front face of the port, preventing the ground path and electromagnetic shielding provided by the cable's outer conductor to extend all the way through to the port without interruption. *Id.* at ¶ 10. In 2009, a team of engineers at PPC devised a means of employing a highly conductive element, referred to in the patents in suit as a "continuity member," positioned within the

connector and designed to extend and maintain the desired, consistent electrical path from the cable's outer conductor through the nut and the post to the receiving port. *Id.* at ¶ 18.

The following drawing, which appears in all four of the patents in suit as reflecting one potential embodiment of the invention disclosed, provides useful illustration:



FIG. 1

This figure is described as "depict[ing] an exploded perspective cut-away view of an embodiment of the elements of an embodiment of a coaxial cable connector having an embodiment of an electrical continuity member, in accordance with the present invention[.]" *See, e.g.*, '237 Patent at

2:53-56.  It discloses a coaxial cable connector **100** with one embodiment of a continuity member **70** contemplated under the patents in suit.  *Id.* at 5:66-6:1.  The coaxial cable connector **100** may then be connected to a coaxial cable **10** containing a protective outer jacket **12**, a conductive grounding shield **14**, an interior insulating, dielectric member **16**, and a center conductor **18**.  *Id.* at 6:1-5.  The connector may also include a coaxial cable interface port **20** that has a conductive receptacle design for receiving a portion of the coaxial center connector **18** sufficient to make adequate electrical contact.  *Id.* at 6:48-52.  In Figure 1, the cable connector **100** may also include a nut **30**, a post **40**, a connector body **50,** a fastener member **60**, a continuity member **70**, and a connector body sealing member, such as an O ring, **80**.  *Id.* at 7:10-16.  Figure 1 also displays a post **40** that may include a flange comprised of a rearward facing surface **45** that faces the forward facing surface **35** of the nut **30** when the cable connector is engaged.  *Id.* at 8:5-13.  The coaxial cable connector **100** may also include a connector body **50** as well as a fastener member **60.**  *Id.* at 9:1-2, 9:57-58.

PPC began marketing a connector containing the continuity feature disclosed in the four patents in 2010, originally under the name Ex® Plus, and later as the EX® SignalTight™ connector.  Dkt. No. 41-2 at ¶ 18; Dkt.

No. 41-1 at ¶ 12.  The continuity member is now a distinguishing feature of the four patents in suit.  *Id.*  PPC maintains that Corning Gilbert's UltraShield connectors infringe the claims of those four patents.  Dkt. No. 24 at ¶¶ 29, 34, 39, 44.

III.    <u>PROCEDURAL HISTORY</u>

Plaintiff commenced this action on June 5, 2012, alleging infringement of the '237 Patent.  Dkt. No. 1.  Plaintiff's complaint was thereafter amended to add the three subsequently issued but related patents into the case.  Dkt. Nos. 15, 24.  Corning Gilbert has answered plaintiff's complaint, as amended, denying infringement, setting forth various affirmative defenses, and counterclaiming seeking a declaratory judgment of non-infringement, invalidity, and unenforceability.  Dkt. No. 28.

In accordance with this court's local patent rules, the parties have requested guidance concerning the following disputed terms contained within the claims of the four patents in suit:

| Term | Patent Implicated |
| --- | --- |
| continuity member | '237, '320, '060, '353 |
| electrical grounding continuity and/or electrical continuity | '237, '320, '060, '353 |
| positioned along the post | '237 |
| a post, engageable with the connector body; a post engaged with the connector body; the connector body being configured to engage the post when the connector is assembled; a post attached to the connector body | '237, '320 |
| connector body | '237, '320 |

| Term | Patent Implicated |
|---|---|
| flange of the post | '237 |
| lip surface | '060, '353 |
| the nut does not touch the connector body | '320 |
| prevents the connector body from contacting the nut | '320 |
| conductive coating | '060 |
| obtains electrical continuity | '320 |
| coaxial cable includes a center conductor surrounded by a dielectric covered by a conductive grounding shield, the conductive grounding shield being configured to be surrounded by a protective outer jack | '320 |

Following the submission of extensive briefing and materials regarding these twelve disputed claim terms, Dkt. Nos. 41, 42, 57, 58, 62, the court held a claim construction hearing on August 7, 2013, Text Minute Entry Dated Aug. 7, 2013.

III.  DISCUSSION

A.  Claim Construction: The Legal Framework

Patent claim construction represents an issue of law to be decided by the court.  *Aventis Pharma S.A. v. Hospira, Inc.,* 675 F.3d 1324, 1329 (Fed. Cir. 2012); *Cybor Corp. V. FAS Techs., Inc.,* 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc); *see also Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004) ("The meaning and scope of patent claim terms, as determined by a district court's claim construction rulings, are legal issues central to most patent cases.").   In its decision in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005), the Federal Circuit provided

comprehensive guidance concerning claim construction, discussing the relative importance of a patent's specification, its prosecution history, and extrinsic evidence regarding the meaning of claim terms and the state of art at the relevant times. *Phillips*, 415 F.3d at 1314. When exercising the claim construction function, a court should generally assign the ordinary and customary meaning to a contested claim term. *Id.* at 1312. "The ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention."[2] *Id.* at 1313; *accord, Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012); *see also CCS Fitness, Inc. v. Brunswick Corp.,* 288 F.3d 1359, 1366 (Fed. Cir. 2002) ("Generally speaking, we indulge a 'heavy presumption' that a claim term carries its ordinary and customary meaning.").

There are two exceptions to this general rule. The first applies when the patentee has acted as his own lexicographer, attributing a particularized definition to a claim term. *Thorner*, 669 F.3d at 1365; *Phillips*, 415 F.3d at 1316; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d

---

[2]    In its opening construction brief, plaintiff has explained that, in this case, "a person of ordinary skill in the art in question" is someone "who, by 2009, had at least a bachelor's degree in engineering and several years experience in the cable and telecommunications industry relating to the design, manufacture, or utilization of coaxial cable connectors in communications systems." Dkt. No. 41 at 11 n.2. Defendant has neither opposed this explanation nor offered its own. *See generally* Dkt. Nos. 42, 57.

1576, 1582 (Fed. Cir. 1996). "To act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term' other than its plain and ordinary meaning." *Thorner,* 669 F.3d at 1365 (quoting *CCS Fitness, Inc.*, 288 F.3d at 1366); *accord, Aventis Pharma S.A.*, 675 F.3d at 1330. Under the second exception, a claim term may also properly be given a meaning that is different than its customary meaning "when a patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner,* 669 F.3d at 1366 (citing *Vitronics Corp.*, 90 F.3d at 1580); *accord, Aventis Pharma S.A.,* 675 F.3d at 1330. Both exceptions to the otherwise general rule that patent terms should be given their ordinary meaning are both narrow and exacting. *Thorner*, 669 F.3d at 1366-67.

While the words of a patent claim will generally control, they should not be interpreted in isolation; "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. Indeed, a patent's specification often constitutes the "single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. In this respect, a patent specification, which some liken to an internal dictionary, must be

carefully reviewed to determine whether, for example, the inventor has used a particular term in a manner inconsistent with its ordinary meaning. *Id.* When resorting to a patent's specification for guidance with respect to disputed claim terms, a court must consider it as a whole, and where possible, all portions should be read in a manner that renders the patent internally consistent. *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1379-80 (Fed. Cir. 2001).

Although the language of a patent specification can provide important clues regarding the proper construction to be accorded to a claim term, there are limitations upon its usefulness. "[W]hile it is true that claims are to be interpreted *in light of* the specification and with a view to ascertaining the invention, it does not follow that limitations from the specification may be read into the claims." *Sjolund v. Musland*, 847 F.2d 1573, 1581 (Fed. Cir. 1988) (emphasis in original). "Nor should particular embodiments in the specification be read into the claims; the general rule is that the claims of a patent are not limited to the preferred embodiment." *Cornell Univ. v. Hewlett-Packard Co.,* 313 F. Supp. 2d 114, 126 (N.D.N.Y. 2004) (Mordue, J.) (citing, *inter alia*, *Texas Digital Sys., Inc. v. Telegenix, Inc.,* 308 F.3d 1193, 1204 (Fed. Cir. 2002)).

In addition to the ordinary meaning of a claim term itself, and the patent's specification, a third category of relevant intrinsic evidence worthy of consideration when undertaking claim construction is the prosecution history of the patent. *Phillips*, 415 F.3d at 1314. That history is generally comprised of "the complete record of proceedings before the Patent and Trademark Office [("PTO")], including any express representations made by the applicant regarding the intended scope of the claims," and an examination of any relevant prior art. *Vitronics*, 90 F.3d at 1582-83. Such evidence, which typically chronicles the dialogue between the inventor and the PTO leading up to the issuance of a patent, and thus can act as a reliable indicator of any limitations or concessions on the part of the applicant, oftentimes proves highly instructive on the issue of claim construction. *See Phillips*, 415 F.3d at 1317 ("[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be.").

If a court's analysis of the available intrinsic evidence resolves any perceived ambiguity in a disputed claim term, then the inquiry is ended. *Vitronics*, 90 F.3d at 1583. Where uncertainty persists regarding a claim

after consideration of all available intrinsic evidence, however, the court may then turn to available extrinsic sources, such as expert or inventor testimony, dictionaries, and technical treatises and articles to assist in reconciling any conflicting intrinsic indicators. *Id.* at 1584. It should be noted, however, that extrinsic evidence may only be used to aid the court in understanding patent claims, and cannot be relied upon to justify any departure from or contradiction of the actual claim language employed by the applicant. *Id.* To assist in resolving an ambiguity, in its discretion, a court may admit and rely on prior art, whether or not it is cited in the specification or file history. *Id.* at 1585. Prior art and dictionaries, as publicly accessible and objective information, are, for obvious reasons, preferable to expert testimony as tools for resolving ambiguity. *Id.*; *see also Texas Digital Sys.*, 308 F.3d at 1202-03.

As will be seen, the claim construction disagreement in this case stems in large part from Corning Gilbert's assertion that many of the disputed terms are capable of being understood by a lay jury, and therefore need no further refinement. *See generally* Dkt. No. 42. As PPC argues, however, such an approach is fraught with danger, in that it serves as an invitation to the parties to argue matters to the jury that are properly reserved for the court. *See CytoLogix Corp. v. Ventana Med. Sys., Inc.*,

424 F.3d 1168, 1172 (Fed. Cir. 2005) (finding that district court erred in permitting conflicting expert testimony regarding claim construction to be heard by the jury, even though the district court made it clear to the jury that its claim constructions control).  It is true, of course, that claim construction is not an exercise that requires the court to construe each and every term of a particular patent claim.  *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("We. . . recognize that district courts are not (and should not be) required to construe *every* limitation present in a patent's asserted claims." (emphasis in original)).  Indeed, no useful purpose is served when a court merely substitutes one term for another, equally understandable claim term for the mere sake of claim construction.  This principle applies, however, only if the ordinary meaning of a claim term can be readily understood by a lay jury, its customary meaning was intended by the patentee, and applying the ordinary meaning would resolve the parties' dispute concerning interpretation.  *O2 Micro Int'l Ltd.*, 521 F.3d at 1360-61.  A court may not abdicate its responsibility for determining the scope of a patent claim term for the jury when necessary to resolve parties' disagreement regarding construction.  *Id.* at 1361-62.  Indeed, as the Federal Circuit has made clear,

> it is the duty of trial courts in [cases involving
> disputed claim terms] to inform jurors both of the
> court's claim construction rulings on all disputed
> claim terms and of the jury's obligation to adopt and
> apply the court's determined meanings of disputed
> claim terms in the jury's deliberations of the facts.

*Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1359 (Fed. Cir. 2004).

### B.   Construction of Disputed Terms

The twelve disputed terms in this matter implicate several of the claims, both dependent and independent, of the four related patents in suit.  The following constitute representative samples of the claims implicated by the parties' claim construction dispute:

'237 Patent, Claim 1

> **1.**  A coaxial cable connector comprising:
> a connector body;
> a post, engageable with the connector body,
> wherein the post includes a flange;
> a nut, axially rotatable with respect to the post and
> the connector body, the nut having
>> a first end configured for coupling to an
>> interface port and an opposing second end,
>> and
>> an internal lip, the internal lip having a first
>> surface facing the first end of the nut and a
>> second surface facing the second end of the
>> nut; and
>
> a continuity member, positioned along the post, the
> continuity member having
>> a post contact portion, the post contact portion
>> positioned to contact the post, and

a nut contact portion, the nut contact portion
positioned to contact the second surface of
the internal lip of the nut, and
wherein, the continuity member enhances electrical
grounding continuity through the post and the nut.

## '320 Patent, Claim 1

**1.** A coaxial cable connector comprising:
a connector body;
a post engaged with the connector body, wherein
the post includes a flange;
a nut, axially rotatable with respect to the post and
the connector body, the nut having a first end
configured for coupling to an interface port, and an
opposing second end, wherein the nut includes an
internal lip, and wherein the second end portion of
the nut starts at a side of the lip of the nut facing
the first end of the nut and extends rearward to the
second end of the nut;
a continuity member disposed only rearward of the
start of the second end portion of the nut and
contacting the post and the nut, so that the
continuity member extends electrical grounding
continuity through the post and the nut; and
wherein the nut does not touch the connector body,
and the continuity member is configured to contact a
rearward facing surface of the lip of the nut and
extend between a portion of the post and a portion
of the connector body.

## '320 Patent, Claim 10

**10.** A coaxial cable connector comprising
a connector body;
a post operably attached to the connector body, the
post having a flange;
a nut axially rotatable with respect to the post and
the connector body, the nut including an inward lip,

wherein the nut has a first end configured for coupling to an interface port, and an opposing second end;
an electrical continuity member disposed axially rearward of a surface of the internal lip of the nut that faces the flange and the first end of the nut, wherein the continuity member electrically contacts both the nut and the post; and
wherein the nut does not touch the connector body, and the continuity member is configured to contact a rearward facing surface of the lip of the nut and extend between a portion of the post and a portion of the connector body.

'320 Patent, Claim 18

**18.** A coaxial cable connector comprising:
a connector body;
a post attached to the connector body, the post having a flange, wherein the flange of the post has a forward facing surface and a rearward facing surface;
a nut axially rotatable with respect to the post and the connector body, the nut including an inward lip, wherein the inward lip of the nut has a forward facing surface, a rearward facing surface, and an innermost  portion between the forward facing surface and the rearward facing surface; and
an electrical continuity member positioned to contact the post, and the nut, wherein the electrical continuity member contacts and electrically couples the post to the nut at a position other than between the rearward facing surface of the flange of the post and the forward facing surface of the lip of the nut;
wherein the forward facing surface of the inward lip of the nut rotates about the rearward facing surface of the flange of the post, and the continuity member is configured to contact the rearward facing surface of the lip of the nut and extend between a portion of the post and a portion of the connector body.

'320 Patent, Claim 32

    **32.**  A coaxial cable connector comprising
a connector body;
a post attached to the connector body, the post having a flange, wherein the flange of the post has a forward facing surface and a rearward facing surface;
a nut axially rotatable with respect to the post and the connector body, the nut including an inward lip, wherein the inward lip of the nut has a forward facing surface, and a rearward facing surface;
an electrical continuity member positioned to contact the post, the body, and the nut, wherein the electrical continuity member contacts and electrically couples the post to the nut at a position other than between the rearward facing surface of the flange of the post and the forward facing surface of the lip of the nut;
a fastener member having a ramped surface to seal the connector body against a cable; and
wherein the continuity member is configured to contact a rearward facing surface of the lip of the nut and reside between a portion of the post and a portion of the connector body.

'353 Patent, Claim 7

    **7.**  A method of assembling a coaxial cable connector for a coaxial cable, the coaxial cable having a center conductor surrounded by a dielectric, the dielectric surrounded by a conductive grounding shield,  the  conductive  grounding shield surrounded by a protective outer jacket, the method comprising:
providing a connector body;
providing a post having a forward end and a rearward end, the forward end including a flange having a forward facing surface configured to face an interface port when the connector is coupled to

the interface port and a rearward facing surface facing the rearward end of the post, wherein the rearward end of the post is configured to contact at least a portion of the conductive grounding shield of the coaxial cable when the cable is attached to the connector;

arranging a portion of a post within a portion of the connector body;

positioning a nut so as to be rotatable relative to the post and the connector body, the nut including an inward lip, wherein the inward lip of the nut has a forward facing surface, a rearward facing surface, and an innermost portion extending between the forward facing surface and the rearward facing surface;

positioning an electrical continuity member so as to contact the rearward facing surface of the inward lip of the nut, extend between a portion of the post and a portion of the connector body, electrically couple the post to the nut at a position other than between the rearward facing surface of the flange of the post and the forward facing surface of the lip of the nut, and maintain electrical continuity between the post and the nut when the post pivots relative to the nut; and

rotating the forward facing surface of the inward lip of the nut about the rearward facing surface of the flange of the post.

'353 Patent, Claim 20

**20.**    A method assembling a coaxial cable connector for a coaxial cable, the coaxial cable having a center conductor surrounded by a dielectric, the dielectric surrounded by a conductive grounding shield, the conductive grounding shield surrounded by a protective outer jacket, the method comprising:

providing a post having a forward end and a rearward end, the forward end including a flange having a forward facing surface configured to face

an interface port when the connector is coupled to the interface port and a rearward facing surface facing the rearward end of the post, the rearward end of the post being arranged so as to be inserted into an end of the coaxial cable around the dielectric and under at least a portion of the conductive grounding shield so as to form an electrical connection with the conductive grounding shield; providing a connector body having a forward end and a rearward end configured to receive a portion of the coaxial cable, the connector body being configured to engage the post when the connector is assembled;

positioning a portion of the post within the connector body;

providing a nut having a forward end configured for engaging the interface port, a rearward end, and an inward lip, wherein the inward lip of the nut has a forward facing surface facing the forward end of the nut, a rearward facing surface facing the reward end of the nut, and an intermediate portion between the forward facing surface and the rearward facing surface;

positioning the nut so as to be axially rotatable relative to the post and the connector body;

rotating the forward facing surface of the inward lip of the nut about the rearward facing surface of the flange of the post; and

positioning an electrical continuity member so as to extend between portion of the post and a portion of the connector body, contact the post, contact the rearward facing surface of the inward lip of the nut, electrically connect the post and the nut at a position other than between the rearward facing surface of the flange of the post and the forward facing surface of the lip of the nut, and maintain electrical continuity between the post and the nut when the post rotates relative to the nut.

**1.** A connector for coupling an end of a coaxial cable, the coaxial cable having a center conductor surrounded by a dielectric, the dielectric being surrounded by a conductive grounding shield, the conductive grounding shield being surrounded by a protective outer jacket, the connector comprising:

a post including a forward post end, a rearward post end, and a flange having a forward facing flange surface, a rearward facing flange surface, a lip surface extending from the rearward facing flange surface, and a continuity post engaging surface extending from the lip surface, wherein the rearward post end is configured to be inserted into an end of the coaxial cable around the dielectric and under at least a portion of the conductive grounding shield thereof to make electrical contact with the conductive grounding shield of the coaxial cable;

a connector body having a forward body end, a rearward body end, and a continuity body engaging surface configured to fit the continuity post engaging surface of the flange of the post when the connector body is positioned around a portion of the post;

a coupler configured to rotate relative to the post and the connector body, the coupler including a forward coupler end configured for fastening to an interface port and to move between a partially tightened coupler position on the interface port and a fully tightened coupler position on the interface port, a rearward coupler end, and an internal lip having a forward facing lip surface facing the forward coupler end and configured to rotate relative to the rearward facing flange surface of the post and allow the post to pivot relative to the coupler, a rearward facing lip surface facing the rearward coupler end, and an intermediate surface between the forward facing lip surface and the rearward facing lip surface, the intermediate surface configured to fit the lip surface of the flange of the post

that extends from the rearward facing flange surface of the flange of the post; and

a continuity member disposed only rearward of the forward facing lip surface of the internal lip of the coupler, the continuity member having a continuity base portion extending between the continuity post engaging surface of the post and the continuity body engaging surface of the connector body, and a continuity contact surface configured to be biased against the rearward facing lip surface of the internal lip of the coupler so as to maintain electrical continuity between the coupler and the post when the coupler is in the partially tightened position on the interface port, even when the coupler is in the fully tightened position on the interface port, and even when the post moves relative to the coupler.

With the claim construction principles articulated above and the foregoing representative patent claims as a backdrop, I now turn to the specific claim terms in dispute.

### 1.  Continuity Member

The first disputed term is "continuity member."  This is a phrase that is pervasive throughout the four patents in suit, and central to the invention disclosed in those patents.  On its face, this term does not appear to have a commonly understood meaning to the average lay person, including an ordinary juror.  Indeed, it appears that even to those skilled in the art, the phrase is highly contextual.  *See, e.g.*, Dkt. No. 41-1 at ¶ 15.  PPC urges that the term be defined as "[a] conductive component configured to extend and maintain a consistent electrical ground path through the

nut/coupler and the post." Dkt. No. 41 at 15. Corning Gilbert counters that no construction of this term is necessary. Dkt. No. 42 at 27-28.

The one physical attribute contained within the definition proposed by PPC for this term is that the continuity member be conductive. This is consistent with the patent specification of the four patents, which, by way of example, teach "a continuity member **70** is conductive" and "[a] continuity member **70** is formed of conductive materials." '237 Patent at 11:6-7, 39-40. Similarly, the patents teach that, "while it is critical that continuity member embodiments be comprised of conductive material, it should be appreciated the continuity members may optionally be comprised of alloys, such as cuprous alloys formulated to have excellent resilience and conductivity." *Id.* at 17:50-51.

The difficulty with PPC's proposed construction is that it speaks to the function to be served by the continuity member, and in doing so renders portions of the claims in the patents in suit redundant.[3] That the continuity member performs the function of extending electrical grounding

---

[3] Of course, that the construction proposed by PPC describes less of the continuity member's physical attributes than the function it serves is, in theory, appropriate according to the Federal Circuit. *See Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1366 (Fed. Cir. 2010) ("The use of . . . functional language to construe and explain a claim term is not improper."); *Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("It is . . . entirely proper to consider the functions of an invention in seeking to determine the meaning of particular claim language."); *accord ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1375-76 (Fed. Cir. 2009).

continuity through the post and the nut, as asserted by PPC, is made clear from the patent specifications, including the figures associated with the specifications. *See, e.g.*, '237 Patent , Figures 5-7, 9, 11, 13, 15, 17, 19-20, 24, 29, 30, 31, 32, 37, 38, 40, 41, 49, 50 and 53. By way of example, Claim 1 of the '237 Patent, in addition to specifying the position of the continuity member, provides that it "enhances electrical grounding continuity through the post and the nut." '237 Patent at 21:24-25. In describing the patented invention, moreover, the patent abstracts explain that the "continuity member [is] disposed within the second end portion of the nut and contacting the post and the nut, so that the continuity member extends electrical grounding continuity through the post and the nut[.]" *See, e.g., id.*, Abstract. The patent specifications also explain that,

> [w]hen in operation, an electrical continuity member **970** should maintain electrical contact with both of the post **940** and the nut **930**, as the nut **930** operably moves rotationally about an axis with respect to the rest of the coaxial cable connector **900** components, such as the post **940**, the connector body **950** and the fastener member **960**. Thus, when the connector **900** is fastened with the coaxial cable **10** a continuous electrical shield may extend from the outer grounding sheath **14** of the cable **10**, through the post **940** and the electrical continuity member **970** to the nut or coupler **930**, which coupler **930** ultimately may be fastened to an interface port . . . thereby completing a grounding path from the cable **10** through the port **20**.

*Id.* at 16:23-34. The patents in suit further teach that continuity members can have "flexibly raised portions . . . [that] make resilient and consistent physical and electrical contact with a conductive surface of the nut **1230**," *id.* at 19:5-8, and that they can "have nut contact tabs **1278***a-b* [that] may enhance the member's **1270** ability to make consistent operable contact with a surface of the nut **1230**," *id.* at 19:14-16. Moreover, the specifications state that different "geometric configurations may be utilized for the post contact portion **1277**, as long as the electrical continuity member **1270** is provided so as to make consistent physical and electrical contact with the post **1240** when assembled in a coaxial cable connector **1200**." *Id.* at 19:34-38.

As can be seen, a close examination of the patents, including their claims, specifications, abstracts, and embodiments, all reveal that the continuity member is, as proposed by PPC, "[a] conductive component configured to extend and maintain a consistent ground path through the nut/coupler and the post." Dkt. No. 41 at 15. That PPC's proposed construction, however, is an accurate recitation of the term's functional attributes does not render construction necessary in the first place. Where construction of a term would "contribute nothing but meaningless verbiage to the definition of the claimed invention," the court need not adopt a

party's suggestion.  *Harris Corp. v. IXYS Corp.*, 114 F.3d 1149, 1152 (Fed. Cir. 1997); *see also U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement.  It is not an obligatory exercise in redundancy.").  However, mindful that the term "continuity member" appears to be highly contextual to even those skilled in the art, and that the parties dispute the proper construction of the term, I have opted to construe it in this case.  To avoid as much redundancy as possible, I recommend that the term "continuity member" be construed as simply a "conductive component that provides continuity of grounding."

> ### 2.  Electrical Grounding Continuity and/or Electrical Continuity

The parties next seek assistance in resolving their dispute over the terms "electrical grounding continuity" and "electrical continuity."  These terms also appear in all four of the patents, and play a prominent role in the invention disclosed.  PPC argues that the term should be construed as "[a] ground path through the nut and the post resulting from a consistent electrical contact between the continuity member, nut and post."  Dkt. No. 41 at 17-18.  In response, Corning Gilbert again submits that these are

readily understandable terms that do not require construction.  Dkt. No. 42 at 27-30.

As Corning Gilbert argues, these disputed terms appear to be comprised of words that are readily understood in the context of the patents in suit.  PPC's proposed construction would expand those terms by specifying the path followed by the desired continuity, as well as the means by which it is to be accomplished – that is, "from the consistent electrical contact between the continuity member, nut and post."  This proposal, however, is too broad, and the patent specifications do not support such a construction.  While it may be true that the desired continuity be achieved as PPC contends, there is nothing in the claims or in the specifications to suggest that this is an additional limitation subsumed within the concept of continuity.

Moreover, were the court to accept PPC's definition, some of the claim language regarding the path of the electrical grounding continuity would be at risk of being rendered superfluous.  For example, Claim 1 of the '237 Patent discloses that "the continuity member enhances electrical grounding continuity through the post and the nut."  '237 Patent, 21:24-25.  PPC's proposed construction conveys the same concept using virtually identical language, where it "refers to a ground path through the nut and

post resulting from the consistent electrical contact between the continuity member, nut and post." Dkt. No. 41 at 18. As was previously noted, where a proposed definition of a term does nothing more than add unnecessary words to a claim's meaning, or renders claim language redundant, a court should resist the urge to construe the term. *Harris Corp.*, 114 F.3d at 1152; *U.S. Surgical Corp.*, 103 F.3d at 1568.

For the foregoing reasons, I recommend that the court not construe these terms, and instead conclude that they are readily understandable by a lay jury.

### 3.   Positioned Along the Post

The '237 Patent specifies a continuity member that is "positioned along the post." As a proposed construction for this term, PPC offers "[l]ocated at a point on the length of the post, and behind the first surface of the internal lip of the nut." Dkt. No. 41 at 18. Once again, Corning Gilbert submits that no construction of this term is necessary. Dkt. No. 42 at 28.

Ordinarily, it would be improper for the court to modify a term like "positioned along the post," which is a commonly understood phrase, by adding language that would restrict that term. *See Integrated Liner Techs., Inc. v. Speciality Silicone Prods., Inc.*, No. 09-CV-1285, 2011 WL

5080191, at *7 (N.D.N.Y. Apr. 7, 2011) (Peebles, M.J.) ("[T]o limit a claim term is improper and should be rejected." (citing *Cornell Univ.*, 313 F. Supp. 2d at 126)).   An inventor can, however, through a patent specification or prosecution history, be deemed to have limited an otherwise more expansive term such as that now at issue.  *See Thorner,* 669 F.3d at 1367 ("The patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope.").  To disavow the full scope of a patent term, however, a patentee must clearly manifest an intention in the patent specification to exclude a particular feature where, when read broadly, the claim terms could otherwise be found to include that feature.  *Id.* at 1366.

The portion of the specification that references Figures 8 through 19, depicting various continuity member embodiments, notes that "all continuity members have at least a conductive portion and all reside rearward of the forward facing surface **35** of the internal lip **34** of the nut **30** and rearward the start of the second end portion **37** of the nut **30** of each coaxial cable connector embodiment **100** into which they are assembled." '237 Patent at 13:60-65.  This is consistent with statements made to the PTO by the inventors during patent prosecution, in which they

distinguished prior art by noting that the inventions disclosed in other, earlier patents included continuity members that use "axially forward a first surface of the lip of the nut facing the flange of the post," and therefore were distinguishable.  Dkt. No. 41-3 at 17.  A representative embodiment disclosing this positioning is shown in Figure 50 below.



FIG. 50

Given the patentees' disavowal of positioning of the continuity member in front of, or forward of the first surface of the lip of the nut, I recommend that this term be construed as "located a point on the length of the post, and behind the first surface of the internal lip of the nut," as advocated by PPC.  To accept Corning Gilbert's argument that no

30

construction is necessary would ignore the intentional surrender of the broader scope of positioning, as reflected in the specification and prosecution history, and impermissibly allow Corning Gilbert to argue, in support of their claim of invalidity, that the term encompasses a disavowed scope.

### 4. A Post, Engageable with the Connector Body

Various claims of the '237 and '320 Patents disclose a post that is "engageable with," "engaged with," or "attached to" to the connector body.[4]  PPC urges the court to construe those terms conceptually to mean that "[t]he post and connector body, which are separate components of the connector (*i.e.*, they are not a single integral component), are interlocked with one another to prevent axial movement of one relative to the other." Dkt. No. 41 at 20.  Corning Gilbert again counters that no construction of these terms is necessary.  Dkt. No. 42 at 27-28.

One of the primary areas of disagreement in connection with this term surrounds the question of whether the post and connector body must always be separate and distinct components of a connector.  *Compare*

---

[4]      Claim 1 of the '237 Patent specifies, *inter alia* "a post, engageable with the connector body."  Similar language appears in several claims of Patent '320, including Claim 1, which references "a post engaged with the connector body"; Claim 9, disclosing "a post engaged with the connector body"; Claim 12, detailing "the connector body being configured to engage the post when the connector is assembled"; Claim 18, specifying "a post attached to the connector body"; and Claim 32 "a post attached to the connector body."

Dkt. No. 41 at 20-21 *with* Dkt. No. 57 at 12-13.  Corning freely acknowledges that if no further refinement of the phrase is provided, it will argue invalidity based upon Japanese Patent No. 450,3793,B issued on July 14, 2010, which discloses a post that is integral with the connector body .  *See, e.g.*, Dkt. No. 41-12 at 2.

The construction now offered by PPC is both consistent with the relevant patent specifications, and logically comports with the ordinary meaning of the disputed terms.  If the connector body and post were made of a single unitary piece, it would not be necessary to add the limitations that they be "engageable," "configured to engage," or "attached."   In addition, the specifications teach the requirement that the connector body and post be interlocked with one another to prevent axial movement of one relative to the other.  *See, e.g.*, '237 Patent at 8:19-33, 9:4-29, 13:18-42, 20:9-14.  This is consistent with the dictionary definition of "engage," which carries with it the concept of becoming interlocked, attached, joined, fastened or connected.  *See engage, v.*, Oxford English Dictionary, http://www.oed.com/view/Entry/62192?rskey=PaU70f&result=3&isAdvanc ed=false#eid (last visited Nov. 26, 2013) (defining "engage," *inter alia*, as "[t]o entangle," "[t]o fasten, attach," "[t]o interlock with, fit into a corresponding part"); *see also The Am. Heritage Dictionary of the English*

*Language* 592 (Joseph P. Pickett, *et al.* eds.) 4th ed. 2000 (defining "engage," *inter alia*, as "[t]o interlock or cause to interlock").

Under the circumstances, I find that the term should be construed as including a post and connector that are two separate components, as PPC argues. Accordingly, I recommend that the terms be interpreted to mean "a post and connector body, which are separate components of the connector (*i.e.*, they are not a single integral component), that are interlocked with one another to prevent axial movement of one relative to the other."

        5.    <u>Connector Body</u>

The next disputed term, "connector body," which appears in the '237 and '320 Patents, seems readily understandable and non-controversial. In its opening construction brief, PPC argued that the term should be construed as "[i]n keeping with the ordinary and customary meaning of the term, the connector body can be comprised of more than one piece." Dkt. No. 41 at 21. In its claim construction brief, Corning Gilbert initially argued that the term should be construed as "[a] portion of the connector that is secured to the post at one end in a manner that prevents the two components from moving with respect to each other in a direction parallel to the axis of the connector." Dkt. No. 42 at 19. Subsequent to the close

of briefing, however, the parties have refined their positions regarding the construction of this term.  Specifically, during the *Markman* hearing, Corning Gilbert offered an alternative proposed construction, defining the term as "[a] portion of the connector secured to the post at one end of the body and which cooperates with or otherwise is functionally located in a radially spaced relationship with the post to define an annular chamber with a rear opening."  Corning Glibert *Markman* Hearing Slide No. 43. PPC argues that this proposal is unduly lengthy and confusing because it essentially substitutes a protracted definition, containing terms that may be difficult for a lay jury to comprehend, with a phrase containing readily understood words.  Dkt. No. 62 at 1.  PPC has responded by counter-proposing a different construction, defining the term as a "[s]tructure of the connector that is secured to the post at one end and includes an open second end for receiving a portion of the coaxial cable.  This 'connector body' structure can be comprised of more than one piece, and, for instance, is not limited to a single integral or unitary one-piece component."  Dkt. No. 62 at 3.

The issue now squarely framed by the parties' positions was presented in another patent case pending in this court, and also involving cable connectors, although under different patents.  *See John*

*Mezzalingua Assocs., Inc. v. Corning Gilbert, Inc.,* No. 11-CV-0761, 2012 WL 5880676 (N.D.N.Y. Sept. 5, 2012) (Peebles, M.J.), *report and recommendation adopted by* 2012 WL 5880674 (N.D.N.Y. Nov. 21, 2012) (Sharpe, C.J.).  Similarly at issue in that case was the question of whether the connector or cylindrical body member specified must be a single unitary piece, or instead could be comprised of more than one component. *John Mezzalingua Assocs., Inc.*, 2012 WL 5880676, at *7.  While ultimately concluding in that case that no additional construction of the disputed term was necessary, in my report I did analyze both the relevant patent claim and specification language, as well as governing case law in rejecting Corning Gilbert's assertion that the components referenced could not be separate pieces.  *Id.* at *9.  PPC now argues that specific guidance from the court concerning this issue is required to prevent Corning Gilbert from attempting to argue claim construction outside of the *Markman* framework, as it has attempted to do in that earlier case.  Dkt. No. 62 at 2-3.

In considering this term, I begin with the proposition that the term "connector body" is not universally defined and understood by persons of ordinary skill in the art.  Dkt. No. 41-1 at ¶¶ 18-19.  As PPC has argued in its brief, in various prior art, the term "connector body" is defined in

different ways.  Dkt. No. 41 at 21-23 (*citing* U.S. Patent No. 5,525,076,

U.S. Patent No. 6,787,076, U.S. Patent No. 6,780,052, and U.S. Patent

4,834,675); *see also* Dkt. No. 41-1 at ¶¶ 21-23.  Referring back to Figure 1

of the '237 Patent, the connector body **50** appears to depict a generic

structure with two open ends.  '237 Patent Figure 1.  The '237 Patent

specification discloses an intent on the part of the inventors that the

connector be securely attached to the post on the end closest to the nut.

'237 Patent at 9:1-24.  Certain claims of the patents in suit also require

that the connector body be deformable or compressible on one end to

facilitate attachment of the cable to the connector.  '237 Patent, Claim 2;

'320 Patent, Claims 9, 17, 32; *see also* '237 Patent at 9:33-37, 10:1-34.

Having carefully reviewed the '237 and '320 Patents, however, including

their specifications, I find no basis to conclude that the inventors intended

to restrict the term connector to a single unitary structure.  Accordingly, I

recommend that the term "connector body" be construed to mean the

"structure of the connector that is secured to the post at one end and

includes an open end for receiving a portion of the coaxial cable.  This

structure can be comprised of more than one piece, and is therefore not

limited to a single integral or unitary one-piece component."

6.   <u>Flange of the Post</u>

Claim 6 of the '237 Patent, a dependent claim, specifies the cable connector of Claim 1 "wherein the continuity member contacts the flange of the post."  '237 Patent, Claim 6.  PPC asserts that this term should be construed as "[a] radial projection of the post that can include one or more steps."  Dkt. No. 41 at 24.  Corning Gilbert asserts that it should be construed as "an externally extending annular protrusion on the post that includes structure that coacts with the internal lip of the nut."  Dkt. No. 42 at 20.

The term "flange" is defined similarly in common dictionaries.  One defines it as "[a] protruding rim, edge, rib, or collar, as on a wheel or a pipe shaft, used to strengthen an object, hold it in place, or attach it to another object."  *The Am. Heritage Dictionary of the English Language* 668-69. Another dictionary defines the term as "a rib or rim for strength, for guiding, or for attachment to another object."  *Merriam-Webster's Collegiate Dictionary* 442 (Frederick C. Mish, *et al.*, eds.) 10th ed. 1999.  The Oxford English Dictionary similarly defines "flange" as "[a] projecting flat rim, collar, or rib, used to strengthen an object, to guide it, to keep it in place, to facilitate its attachment to another object, or for other purposes."  *flange, n.*, Oxford English Dictionary,

http://www.oed.com/view/Entry/71075?rskey=SxRG5U&result=1#eid (last visited Nov. 27, 2013).

The parties' disagreement concerning the meaning to be attributed to this term is focused on whether the flange may be stepped and consist of two separate levels of annular protrusion. Referring to the embodiment depicted in Figure 1, the '237 Patent specification describes a post **40** that

> comprises a first forward end **41** and an opposing second rearward end **42**. Furthermore, the post **40** may comprise a flange **44**, such as an externally extending annular protrusion, located at the first end **41** of the post **40**. The flange **44** includes a rearward facing surface **45** that faces the forward facing surface **35** of the nut **30**, when operably assembled in a coaxial connector **100**, so as to allow the nut to rotate with respect to the other component elements, such as the post **40** and the connector body **50**, of the connector **100**. The rearward facing surface **45** of flange **44** may be a tapered surface facing the second rearward end **42** of the post **40**.

'237 Patent at 8:6-17.

Two things appear clear from a review of this and other portions of the specifications of the four patents in suit. First, the flange can be, but is not limited to, an externally extended annular protrusion. Secondly, nowhere in any of the specifications does the inventor limit the flange to a single step, as opposed to multiple steps.

38

PPC's argument that the flange can be stepped is persuasive. Figure 6 of the '237 Patent, for example, illustrates the point, disclosing that "[t]he continuity member **70** should have an inner diameter sufficient to allow it to move up a substantial length of the post body **40** until it contacts a portion of the post **40** proximate the flange **44** at the first end **41** of the post **40**." '237 Patent at 12:32-36. As can be seen from Figure 6, set forth below, contact between the continuity member of the flange occurs at a lower step of the flange.



FIG. 6

To the extent that Corning Gilbert has, at oral argument and in its papers, contended that the word "proximate" means only "nearby," such a

position is not supported by the common dictionary definitions of the word. Indeed, the word "proximate" is defined in various ways, and can include "[c]losely neighbouring, immediately adjacent, next, nearest (in space, serial order, quality, etc.). Also occas. *fig.*: close, intimate." *proximate, adj.*, Oxford English Dictionary, http://www.oed.com/view/Entry/153562?rskey=gCjneA&result=1#eid (last visited Nov. 27, 2013). A court "may not read narrow claim limitations into broad claims during either a validity or infringement analysis." *Loral Fairchild Corp. v. Victor Co. of Japan, Ltd.*, 906 F. Supp. 798, 803 (E.D.N.Y. 1995) (citing *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1122 (Fed. Cir. 1985)).

Corning Gilbert additionally argues that the "flange of the post" cannot include more than one step because Claim 1 of the '060 Patent "separately claim[s a] structure" that is identified by PPC as the step that may be part of the flange. Dkt. No. 57 at 15-16. Specifically, Corning Gilbert highlights that Claim 1 of the '060 Patent provides for a "lip surface extending from the rearward facing flange surface" – the "lip surface" accounting for the step PPC wishes to include in its definition of the flange. *Id.* This argument by Corning Glibert, however, is flawed because it ignores the fact that the phrase "lip surface extending from the rearward

facing flange surface" is part of a larger phrase that describes what comprises the flange as a whole. To provide context, the entire phrase reads as follows:

> a post including a forward post end, a rearward post end, and a flange having a forward facing flange surface, a rearward facing flange surface, a lip surface extending from the rearward facing flange surface, and a continuity post engaging surface extending from the lip surface . . . .

'060 Patent, Claim 1. As can be seen, the phrase "a lip surface extending from the rearward facing flange surface," in part, describes the flange as a whole, as does the phrase "a forward facing flange surface," "a rearward facing flange surface" and "a continuity post engaging surface extending from the lip surface." Accordingly, "lip surface" as used in Claim 1 of the '060 Patent does not represent a separately claimed structure such that it is not a part of the flange of the post.

Moreover, Corning Gilbert's argument that the "lip surface" "is a different and separately claimed structure" from the flange is directly contradicted by its proposed definition of "lip surface," which, as discussed more completely below, is "*a surface of the flange of the post* that extends from the rearward facing flange surface toward the rearward post end." Dkt. No. 42 at 24 (emphasis added). It is inconsistent for Corning Gilbert to argue that the lip surface is "a different and separately claimed"

structure than the flange when discussing the proper construction of the term "flange of the post," but that the lip surface is part of the flange of the post when construing "lip surface."

Because none of the specifications in the patents at issue limit the flange to a single step, as opposed to multiple steps, I recommend that the court construe the term "flange of the post" to mean "a rim, edge, rib, or collar, protruding from the post that can include one or more steps."

       7.   <u>Lip Surface</u>

The claims of the '060 and '353 Patents include the term "lip surface."  The parties are generally in agreement concerning this term, with one narrow exception.  PPC contends that any definition should make clear that the lip surface refers to the flange of the post.  Dkt. No. 41 at 26-27.  Corning Gilbert, however, asserts that it is unnecessary to add the phrase "with respect to the post," as PPC urges.  Dkt. No. 42 at 24.  I agree with Corning Gilbert's position as it relates to this term.  It appears clear from Corning Gilbert's proposed construction that the lip surface referenced is a surface of the flange of the post.  Accordingly, I recommend that Corning Gilbert's construction be adopted, and that the term "lip surface" be defined as "a surface of the flange of the post that

extends from the rearward facing flange surface toward the rearward post end."

### 8. The Nut Does Not Touch the Connector Body

Claims 1 and 10 of the '320 Patent include a limitation providing that the nut does not touch the connector body. PPC contends that this phrase should be construed as meaning that "there is a physical gap between the nut and the connector body," Dkt. No. 41 at 27, whereas Corning Gilbert argues that no further refinement is necessary, Dkt. No. 42 at 27.

The concept that the nut specified does not touch the connector body is a simple one. There is no indication in the record now before the court that the term has meaning peculiar to one of ordinary skill in the art, or that the inventors, acting as their own lexicographers, intended a different meaning from that which would ordinarily obtain.

In urging that the court further construe this otherwise simple term, PPC accuses Corning Gilbert of interjecting a temporal limitation that would preclude the connector body from ever being so situated as to have the nut touch the body during operation, even "if sufficient axial force was applied to the nut [sic] close the gap." Dkt. No. 41 at 28. Although it is true, as PPC argues, that "infringement is not avoided merely because a non-infringing mode of operation is possible," *Z4 Techs., Inc. v. Microsoft*

*Corp.*, 507 F.3d 1340, 1350 (Fed. Cir. 2007), this is an argument that is more appropriately made in connection with the infringement analysis, rather than during the construction phase.

Having carefully considered the arguments set forth by the parties, I conclude, as Corning Gilbert urges, that the phrase sought to be construed, as understood by those of ordinary skill in the art, is obvious and therefore recommend that no further construction be given.

### 9. Prevents the Connector Body From Contacting the Nut

Claims 2 and 11 of the '320 Patent, which are dependent upon Claims 1 and 10 of the patent, respectively, require that "the location of the continuity member, as assembled in the coaxial cable connector, prevents the connector body from contacting the nut." '320 Patent at 21:8-11, 22:27-30. PPC argues that the phrase should be construed to mean that "[t]he location and configuration of continuity member results in a physical gap between the nut and the connector body in the assembled connector." Dkt. No. 41 at 29. Corning Gilbert, in turn, contends that, for the same reasons asserted with regard to the term "the nut does not touch the connector body," no further refinement is necessary. Dkt. No. 57 at 9-11. For the same reasons discussed above in connection with the previous term, I agree with Corning Gilbert that no further construction is necessary

44

with regard to the phrase "prevents the connector body from contacting the nut."

### 10. Conductive Coating

Claim 7 of the '060 Patent requires that "at least a portion of the component of the connector is formed having conductive coating."  '060 Patent 21:60-62.  PPC urges that the phrase be defined as "[a] layer of material that is conductive."  Dkt. No. 41 at 30.  Corning Gilbert, in contrast, argues that the term should be construed as "a layer of conductive material, applied by a coating process, which covers a non-conductive surface."  Dkt. No. 42 at 22.

The chief battleground with regard to this term is whether the conductive coating must be applied over a non-conductive surface or instead can be a coating overlaying another conductive material. *Compare* Dkt. No. 41 at 30-31 *with* Dkt. No. 42 at 23-24.  To support its position that the underlying surface is not conductive, Corning Gilbert relies upon the following portion of the '060 Patent specification:

> The post **40** should be conductive and may be formed of metals or may be formed of other conductive materials that would facilitate a rigidly formed post body.  In addition, the post may be formed of a combination of both conductive and non-conductive materials.  For example, a metal coating or layer may be applied to a polymer of other non-conductive material.

45

'060 Patent at 8:55-61.  The specification continues, describing various means of manufacturing the post, "includ[ing] casting, extruding, cutting, turning, drilling, knurling, injection molding, spraying, blow molding, component over-molding, combinations thereof, or other fabrication methods that may provide efficient production of the component."  *Id.* at 8:61-65.

It is true, as Corning Gilbert argues, that an example is cited in the '060 Patent involving a conductive coating layer that is applied over a non-conductive material to form the post body.  It is improper, however, to import a limitation not contained in a patent claim, and not disclosed in a patent specification, based upon either an embodiment illustrated and disclosed in a patent, or an example cited.  *See Silicon Graphics, Inc. v. ATI Techs., Inc.*, 607 F.3d 784, 792 (Fed. Cir. 2010) ("A construing court's reliance on the specification must not go so far as to import limitations into claims from examples or embodiments appearing only in a patent's written description unless the specification makes clear that the patentee intends for the claims and the embodiments in the specification to be strictly coextensive." (quotation marks and alterations omitted)).  Nowhere in the '060 Patent specification or patent claims does the inventor expressly limit this term, as Corning Gilbert suggests, to require that the conductive

material be layered over a non-conductive material.  Accordingly, I recommend that the term "conductive coating" be construed simply as "a layer of material that is conductive."

### 11.   Obtains Electrical Continuity

Claims 6, 14, and 29 of the '320 Patent require that "the continuity member facilitates the extension of an electrical ground path and obtains electrical continuity, even when the nut is not fully tightened on the port." '320 Patent at 21:39-42, 22:54-58, 24:33-35.  Corning Gilbert argues that the term is indefinite and thereby renders those claims invalid.  Dkt. No. 42 at 25-26.  PPC argues that the claim term is not indefinite, and offers a proposed construction that would define the term as "[t]he continuity member extends and maintains a consistent electrical ground path through the nut and the post."  Dkt. No. 41 at 31.

As an initial matter, whether a term is invalid does not bear directly on claim construction, and instead is better left for determination on a motion for summary judgment, or at trial, in connection with the defense of invalidity.  *See Ill. Comp. Research LLC v. HarperCollins Publishers, Inc.*, No. 10-CV-9124, 2012 WL 163801, at *3 (S.D.N.Y. Jan. 19, 2012) ("At oral argument the parties made it clear that whether or not images can include typed in text using HTML may implicate prior art—and therefore may have

relevance to invalidity arguments, the merits of which are left for another day.").  In any event, however, the Federal Circuit has made it clear that "[a] claim is indefinite only when it is 'not amenable to construction' or 'insolubly ambiguous.'"  *See, e.g., Biosig Instruments, Inc. v. Nautilus, Inc.*, 715 F.3d 891, 898 (Fed. Cir. 2013) (quoting *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005)).  Indeed, "the definiteness of claim terms depends on whether those terms can be given any reasonable meaning."  *Datamize, LLC*, 417 F.3d at 1347.

In this case, the principal teaching of the four patents in suit is to provide a method of extending electrical continuity from the post through the continuity member to the nut to complete the ground path, and obtain electrical continuity in the cable connection even when the nut is not fully tightened onto the port.  *See, e.g.*, '320 Patent at 15:41-67, 16:28-67, 18:52-59, 20:4-42.  In my view, the term "obtains electrical continuity" is, at least at this juncture, amenable to construction in light of the specifications and claims of the '320 Patent.  Accordingly, and consistent with the language from the specification, I recommend the term be defined as "extends and maintains a consistent electrical ground path through the nut and the post."

12. Coaxial Cable Includes a Center Conductor Surrounded by a Dielectric Covered by a Conductive Grounding Shield, the Conductive Grounding Shield Being Configured to Be Surrounded by a Protective Outer Jack

Claims 4, 12 and 25 of the '320 Patent, which in turn are dependent upon Claims 1, 10 and 18, respectively, contain the language in dispute in this section of the report. '320 Patent at 21:16-31; 22: 31-46; and 24:1-15. Neither of the parties has specifically proposed a definition of this claim term. They do, however, disagree over whether the coaxial cable is an integral part of this claim, in which case a coaxial cable must be installed into the connector before infringement may be found under Claims 4, 12, and 25. Dkt. No. 41 at 32. PPC argues that the claim is not indefinite, and that the presence of the cable is not required for infringement. *Id.* at 32-33. In support of this argument, PPC cites the fact that these are dependent claims and that the independent claims to which they relate specify "a coaxial cable connector comprising[.]" *Id.* at 32. It follows, according to PPC, that those dependent claims simply provide a more detailed description of the type of coaxial cables with which the specified connectors are to be utilized in conjunction. *Id.*

It is true, as PPC argues, that language clearly intended to demonstrate a use of an invention, but without any manifest intention to provide an additional limitation, does not result in a narrowing of a claim.

49

*See, e.g., Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1345 (Fed. Cir. 2005) ("An[ ]intended use or purpose usually will not limit the scope of the claim because such statements usually do no more than define a context in which the invention operates.").  The '320 Patent, however is not drafted in such a manner.  Instead, each of the three dependent claims in issue specifies the presence of a coaxial cable and describes its attributes, as well as providing additional limitations concerning the cable connector.  Accordingly, I recommend against providing a further construction of this term, and that the court reject PPC's request for a finding that the claims do not require the presence of a cable.  *See Boehringer Ingelheim Vetmedica, Inc.*, 320 F.3d at 1345 ("But . . ., preamble language will limit the claim if it recites not merely a context in which the invention may be used, but the essence of the invention without which performance of the recited steps is nothing but an academic exercise.").

IV.   SUMMARY AND RECOMMENDATION

The four patents in suit involve relatively simple concepts, products, and methods, described in terms that, for the most part, are readily understandable.  In many instances the parties have attempted to redraft the portions of the patent claims in issue by importing limitations not

supported by the intrinsic evidence considered by the court.  The parties have also attempted to use the claim construction process to air arguments addressing patent validity.  Having carefully considered the patents in suit, the arguments of the parties, and the relevant and available intrinsic and extrinsic evidence, it is hereby respectfully

RECOMMENDED that the court affix the following meaning to the patent claim terms in dispute.

| Disputed Term | Proposed Construction |
| --- | --- |
| Continuity Member | "conductive component that provides continuity of grounding" |
| Electrical Grounding Continuity and/or Electrical Continuity | no construction necessary |
| Positioned Along the Post | "located a point on the length of the post, and behind the first surface of the internal lip of the nut" |
| A Post, Engageable with the Connector Body" | "a post and connector body, which are separate components, of the connector (*i.e.,* they are not a single integral component), that are interlocked with one another to prevent axial movement of one relative to the other" |
| Connector Body | "structure of the connector that is secured to the post at one end and includes an open end for receiving a portion of the coaxial cable.  This structure can be comprised of more than one piece, and is therefore not limited to a single integral or unitary one-piece component" |
| Flange of the Post | "a rim, edge, rib, or collar, protruding from the post that can include one or more steps" |
| Lip Surface | "a surface of the flange of the post that extends from the rearward facing flange surface toward the rearward post" |
| The Not Does Not Touch the Connector Body | no construction necessary |

| Disputed Term | Proposed Construction |
|---|---|
| Prevents the Connector Body from Contacting the Nut | no construction necessary |
| Conducting Coating | "a layer of material that is conductive" |
| Obtains Electrical Continuity | "extends and maintains a consistent electrical ground path through the nut and the post" |
| Coaxial Cable Includes a Center Conductor Surrounded by a Dielectric Covered by a Conductive Grounding Shield, the Conductive Grounding Shield Being Configured to Be Surrounded by a | no construction necessary |

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:    December 5, 2013
          Syracuse, New York

David E. Peebles
U.S. Magistrate Judge